UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| J. DOE,<br>                Plaintiff,<br>v.<br><br>MARKWAYNE MULLIN, in his official capacity as Secretary of Homeland Security; DAVID VENTURELLA, in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement; RODNEY S. SCOTT, in his official capacity as Commissioner of U.S. Customs and Border Protection; U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; and U.S. CUSTOMS AND BORDER PROTECTION,<br><br>            Defendants | )<br>)<br>)<br>)<br>)    Case No.<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**INTRODUCTION**

1.      On or around August of 2016, Plaintiff J. Doe entered the United States with their minor child, fleeing persecution in their home country. Doe has made the United States their home for nearly ten years, working to provide a better and safer life for themselves and their child.

2.      On February 12, 2026, the Department of Homeland Security ("DHS") issued a Notice and Order ("the Notice") assessing a fine of $1,852,352 against Doe for an alleged willful failure to depart the United States after having been ordered removed. DHS imposed this penalty without identifying any evidence supporting liability, without making any individualized determination of willfulness, and without providing Plaintiff any meaningful opportunity to challenge the agency's conclusions.

3.      Doe's fine is excessive, functionally unpayable, and effectively uncontestable by

1

design. In June of 2025, DHS promulgated an Interim Final Rule (IFR) that stripped the immigration statutory scheme governing such fines of even the bare minimum features of due process. This, the IFR states, is to ensure maximum deterrent effect, in line with IIRIRA's purported purpose: "to enhance immigration enforcement and the consequences of violating the nation's immigration laws." 90 Fed. Reg. at 27339.

4.      Doe asserts that the Department of Homeland Security has created a novel enforcement scheme designed not to adjudicate liability, but to automatically impose crushing civil penalties against noncitizens at industrial scale in order to coerce self-deportation. Through the June 20205 Interim Final Rule, DHS eliminated long standing procedural safeguards, presumed liability without individualized adjudication, and transformed 8 U.S.C. § 1324d into a mechanism for imposing punitive and unpayable financial penalties, untethered from meaningful administrative process.

5.      As such, the IFR, both on its face and as applied to Doe, violates the Immigration and Nationality Act (INA), DHS's own regulations, and the U.S. Constitution. Plaintiff brings this action under the Administrative Procedure Act (APA), 5 U.S.C. § 701 et seq., challenging Defendants' final agency decision imposing the civil monetary penalty under 8 U.S.C. § 1324d, in violation of the Immigration and Nationality Act, the Constitution, and governing administrative law principles.

## JURISDICTION AND VENUE

6.      This action arises under the laws of the United States, including the Administrative Procedures Act ("APA"), 5 U.S.C. § 701 et seq., and the Immigration and Nationality Act ("INA").

7.      This Court has jurisdiction under 28 U.S.C. § 1331 because this case presents federal questions, and 5 U.S.C. § 702, which waives sovereign immunity and authorizes judicial

review of final agency action for persons suffering legal wrong due to agency action. In addition, this court has jurisdiction because the individual Respondents are United States officials. 28 U.S.C. § 1346(a)(2).

8.     The challenged Decision and Order assessing a civil penalty against Doe constitutes final agency action within the meaning of 5 U.S.C. § 704 because it determines Doe's legal obligations, imposes an enforceable monetary penalty, and no further administrative remedies remain.

9.     This Court is authorized to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201-2202 and 5 U.S.C. § 706.

10.     Venue is proper in the Eastern District under 28 U.S.C. § 1391(e)(1) because Doe resides in this district and a substantial part of the events giving rise to the claim occurred here.

11.     Venue is further proper in the Alexandria division because Doe resides within this Division and the relevant agency actions have caused injury in this Division.

**PARTIES**

12.     Plaintiff J. Doe is a noncitizen residing in Alexandria, Virginia. They are the subject of a final order of removal and the recipient of a Decision and Order issued by the Defendants assessing a civil penalty of $1,820,352 pursuant to 8 U.S.C. § 1324d. Doe is indigent and brings this action to challenge that unlawful penalty.

13.     Defendants are federal agencies and officials responsible for the administration and enforcement of the INA, including the assessment of civil penalties under 8 U.S.C. § 1324d.

14.     Defendant Markwayne Mullin is sued in his official capacity as Secretary of the U.S. Department of Homeland Security and is responsible for the administration, policies, and operations of DHS, including enforcement actions taken under the INA.

15. Defendant David Venturella is sued in his official capacity as Acting Director of ICE and is responsible for ICE's enforcement activities, including the initiation, adjudication, and collection of civil penalties under 8 U.S.C. § 1324d.

16. Defendant Rodney S. Scott is sued in his official capacity as Commissioner of the United States Customs and Border Protection (CBP) and is responsible for CBP's enforcement activities, including the initiation, adjudication, and collection of civil penalties under 8 U.S.C. § 1324d.

17. Defendant DHS is an agency of the United States government responsible for administering and enforcing federal immigration laws, including the challenged penalty proceedings.

18. Defendant ICE is a component agency of DHS charged with immigration enforcement functions, including issuance and enforcement of the challenged Decision and Order.

19. Defendant CBP is a component agency of DHS charged with enforcing U.S. regulations, including trade, customs, and immigration.

## STATEMENT OF FACTS

20. Doe is a noncitizen who has resided in the United States since 2016. On June 22, 2017, an order of removal was issued against them.

21. Since the issuance of the removal order, Doe has diligently pursued all available legal remedies to resolve their immigration status, including filing a motion to reopen and rescind the removal order, at the advice of private counsel.

22. Doe has very limited financial means and is currently indigent. The fine assessed by Defendants is grossly disproportionate to Doe's economic circumstances.

23. On February 12, 2026, DHS issued a Notice of Violation and Order ("the Notice")

assessing Doe a civil penalty of $1,820,352.00. <u>Exhibit A, Notice of Violation and Order</u>. As grounds for the civil penalty, the Notice alleged only that Doe "willfully failed or refused to depart from the United States pursuant to the order." *Id*.

24.     The Notice contains no factual allegations supporting a finding of willfulness. Nor does it identify when Doe's conduct allegedly became willful. The penalty itself is imposed as a massive lump sum that fails to itemize daily rates or account for the incremental increases in statutory maximums over time.

25.     On March 6, 2026, Doe filed an opposition to the Notice ("Opposition"). <u>Exhibit B, Opposition to Notice</u>. DHS upheld the Notice in an Appeal Decision and Order ("Appeal Decision") dated March 19, 2026. <u>Exhibit C, Appeal Decision.</u> The statute and regulations provide no further avenue of appeal.

26.     As grounds for the civil penalty, the Appeal Decision stated that Doe "willfully failed or refused to depart from the United States," "willfully failed or refused to make timely application in good faith for travel or other documents necessary for departure," and "willfully failed or refused to present for removal at the time and place required by the Attorney General [or Secretary of Homeland Security]." The Appeal Decision included no additional evidence or records.

## LEGAL FRAMEWORK

**A.    The INA's new civil penalty statutory scheme scales back longstanding protections critical to avoiding unlawfully imposed fines.**

27.     In 1996, Congress enacted the Illegal Immigration Reform and Immigration Responsibility Act (IIRIRA). As part of IIRIRA, Congress authorized certain monetary civil penalties that could be levied against noncitizens who willfully failed to depart the United States.

*See* 8 U.S.C. §§ 1324d(a)(1), 1229c(d)(1). Although previous iterations of the INA included provisions for the "imposition and collection of fines" against noncitizens, *see* 22 Fed. Reg. 9765, 9807 (Dec. 6, 1957), those original regulations are remarkably similar to those later promulgated via IIRIRA, as relevant to this petition.

28.    One such civil penalty, codified at 8 U.S.C. § 1324d, imposes a fine of "not more than $500 . . . for each day" that a noncitizen who has a final order of removal "willfully fails or refuses to— (A) depart from the United States pursuant to [a final order of removal], (B) make timely application in good faith for travel or other documents necessary for departure, or (C) present for removal at the time and place required by the Attorney General." Section 1324d further penalizes any noncitizen with a final order of removal who "conspires to or takes any action designed to prevent or hamper the [noncitizen]'s departure pursuant to the order." *Id*.

29.    The civil penalty at Section 1324d is subject to the five-year statute of limitations for civil fines. 28 U.S.C. § 2462. Thus, a noncitizen with a removal order over five years old can be subject to an accumulated fine of up to $1,820,352, i.e. five years of the daily rate of $998.[1]

30.    Civil fines authorized under Section 1324d and other sections of the INA are paid into an account within the general fund of the U.S. Treasury called the "Immigration Enforcement Account." 8 U.S.C. § 1330(b)(1); § 1330(b)(2)(B). That account is used to "refund . . . expenses incurred by the Attorney General for activities that enhance [immigration] enforcement." *Id*. at § 1330(b)(3)(A). These activities include "investigation, apprehension, detention, and removal" of noncitizens as well as the "repair, maintenance, or construction of the United States border." *Id*. at § 1330(b)(3)(A)(i)–(iii).

---

[1] The statute imposes a $500 per day fine, but the IFR adjusts this amount "for inflation" to $998.

i.  The June 25, 2025 Interim Final Rule (IFR)'s change to longstanding policy on immigration fines

31.     Prior to June of 2025, the imposition of civil fines under the INA was governed by certain procedural requirements codified at 8 C.F.R. § 280.

32.     These pre-June 2025 requirements included the safeguard that the Notice of Intention to Fine, Form I-79, be served on the individual subject to the fine in-person, by mail, or by delivery to the individual's office. *See* 8 C.F.R. § 280.11. Following service, the noncitizen subject to the fine had 30 days to respond and could seek an additional 30-day extension for good cause. *Id.* § 280.12. The noncitizen could also request an interview, consisting of an informal hearing to advance arguments, present evidence, and cross examine witnesses. *Id.*

33.     Upon receiving a response to the Notice, an immigration officer was required to "prepare a report summarizing the evidence and containing his findings and recommendation[s]" about whether and to what extent the fine should be imposed. *Id.* § 280.13(b). Those recommendations were then reviewed by the "district director," who would inform the noncitizen of the decision and "the reasons for such decision." *Id.* The record of these proceedings, including the findings and recommendations of the immigration officer, included "the evidence upon which such Notice was based." *Id.* § 280.14. The noncitizen subject to the fine then had 30 days to appeal any adverse decision to the Board of Immigration Appeals. *Id.* §§ 280.13, 1003.3(a)(2).

34.     On June 27, 2025, ICE and the United States Department of Justice's (DOJ) Executive Office of Immigration Review (EOIR) jointly promulgated an Interim Final Rule: Imposition and Collection of Civil Penalties for Certain Immigration-Related Violations (hereinafter, the "IFR"). *See* 90 Fed. Reg. 27439. The IFR was not subject to Notice and Comment and went into effect immediately. The IFR deliberately dismantles every meaningful procedural

7

safeguard previously governing the imposition of immigration civil penalties enacted by IIRIRA thirty years prior, eliminating nearly every procedural safeguard that had governed immigration civil penalties for decades.

35.    The IFR acknowledges that although the INA's civil monetary penalties have been in effect since 1996, "DHS did not issue any of these penalties until after Executive Order 13768," which President Trump issued in his first term in office to, inter alia, "ensure the assessment and collection of all fines and penalties . . . from [noncitizens] unlawfully present in the United States[.]" 90 Fed. Reg. at 27441-42. By the end of the first Trump Administration, ICE had only twenty-six active civil penalties cases. *Id.*

36.    On January 20, 2021, President Biden rescinded Executive Order 13768. *See* 86 Fed. Reg. 7051 (Jan. 20, 2021). Following that recission, former Secretary of Homeland Security Alejandro Mayorkas stated that "[t]here is no indication that these penalties [under 8 U.S.C. § 1324d] promoted compliance with noncitizens' departure obligations. We can enforce our immigration laws without resorting to ineffective and unnecessary punitive measures." *DHS Announces Rescission of Civil Penalties for Failure-to-Depart*, DHS (Apr. 23, 2021), https://perma.cc/58FL-GAUS.

37.    Beginning on the first day of his second term, President Trump again sought to impose these fines. *See* Executive Order 14159, *Protecting the American People Against Invasion*, 90 Fed. Reg. 8443 (Jan. 20, 2025). In an Executive Order issued on January 20, 2025, President Trump directed former-DHS Secretary Kristi Noem to take "all appropriate action to ensure the assessment and collection of all fines and penalties that [DHS] is authorized by law to assess and collect from [noncitizens] unlawfully present in the United States, including [noncitizens] who unlawfully entered or unlawfully attempted to enter the United States. *Id.* at 8444-45.

38.    DHS has now begun imposing civil penalties at industrial scale, issuing more than 9,000 fines totaling nearly $3 billion within months of the IFR taking effect. *DHS Announces It Will Forgive Failure to Depart Fines for Illegal Aliens Who Self-Deport Through the CBP Home App*, DHS (June 9, 2025), https://perma.cc/JC5Y-D2CE. That number is likely far higher as of the time of this filing.

39.    Pursuant to Executive Order 14159, and ICE's ensuing efforts to impose fines, DHS and DOJ promulgated the IFR to "streamlin[e] the process for imposing civil monetary penalties," citing 8 C.F.R. § 280's "unnecessary procedures and extended timelines."  90 Fed. Reg. at 27442. According to the IFR, the "revised process is intended to allow DHS to impose more civil penalties, more quickly" so that these penalties "will have their intended deterrent effect." *Id.* at 27442, 27446. This, the IFR states, is in line with "the purpose of IIRIRA . . . to enhance immigration enforcement and the consequences of violating the nation's immigration laws."  *Id.* at 27339. Essentially, the agency expressly abandoned procedural safeguards because those safeguards slowed the government's ability to issue penalties at scale.

40.    As justification for the substantial reduction in procedural safeguards related to the imposition of civil monetary penalties, the IFR cites to the nature of the fines themselves, explaining that "[i]n the vast majority of cases, United States Government records will sufficiently establish the facts necessary to demonstrate that the [noncitizen] is subject to these civil monetary penalties." 90 Fed. Reg. at 27442. The IFR further states that "the [noncitizen]'s immigration court records will typically demonstrate that the [noncitizen] was aware of the obligation to depart the United States and, when combined with the [noncitizen]'s failure to do so, will ordinarily raise a *sufficient inference* that the [noncitizen] willfully or voluntarily[sic] failed to depart." *Id.* at 27443 (emphasis added). The IFR further notes that these government records alone will constitute

"incontrovertible records that establish the [noncitizen]'s liability for the penalty." *Id.* The IFR thus presumes liability based exclusively on government-created records, while simultaneously limiting the affected individual's ability to challenge those records.

41.    In substantially reducing the process for appeal of a fine, the IFR states that any noncitizen who wishes to challenge DHS's decision to impose a fine will have "limited grounds to challenge these determinations" and therefore will not require procedure such as a 30 day response timeline, in-person interview, or appeal to the Board of Immigration Appeals. *See* 90 Fed. Reg. at 27444. Rather, according to the IFR, these procedural safeguards are "overly burdensome" to DHS and "could unnecessarily impede ICE's ability to impose these penalties quickly and at [] scale." *Id.* at 27444-45.

42.    Pursuant to the IFR, the process governing issuance and review of civil monetary penalties issued on or after June 27, 2025 is now codified at 8 C.F.R. § 281.1.

43.    Under Section 281.1, DHS is no longer required to "issue and personally serve [Notices of Intent to Fine] and wait for any responses from the [noncitizen] prior to issuing a decision." 90 Fed. Reg. at 27449. "Rather, the IFR requires an immigration officer to initiate the process by issuing a decision and order imposing civil monetary penalties." *Id.* The Notice that has replaced the Form I-79 Notice of Intent to Fine contains minimal, generic allegations that are selected via checking a box. *See* Exh. A. There is no space, nor is an officer required, to indicate the basis for those allegations. *Id.*

44.    To contest a civil penalty issued under Section 281.1, the IFR states that the noncitizen will have only 15 business days to file a written notice of appeal to DHS, and "[e]xtensions to the appeal filing period are prohibited." 90 Fed. Reg. at 27450. The appeal is then reviewed by "a supervisory immigration officer who did not issue the initial decision" within ten

10

days of receiving it. *Id.* "The officer will also provide the [noncitizen] with copies of pertinent documents and records relevant to the penalty, *if the [noncitizen] requests*, unless they are law enforcement sensitive, or disclosure is prohibited by law." *Id.* (emphasis added).

45.    "[T]here is no option for the [noncitizen] to request an in-person interview." *Id.* Nor can a noncitizen appeal to the Board of Immigration Appeals, seek reopening, or seek reconsideration. *Id.* The "supervisory officer's decision is the final agency action unless the Secretary of Homeland Security certifies the decision for review." *Id.* "In sum, a civil penalty decision generally becomes final under the IFR's procedures, and DHS can begin collection efforts: (1) 15 days business days [*sic*] after DHS serves the initial decision" via regular mail, "if the [noncitizen] does not contest the decision or fails to respond[;] or (2) no later than 45 days after the [noncitizen] contests the fine." *Id.*

### ii. DHS's policy of forgiving immigration fines in exchange for self-deportation

46.    DHS created a policy—communicated to the public through published press releases and articles—that the only way to obtain relief from these immigration fines is through self-deportation. In a press release published on June 9, 2025, then-Secretary Kristi Noem was quoted as stating:

> If you are here illegally, use the CBP Home App to take control of your departure and receive financial support to return home . . . If you don't, you will be subjected to fines, arrest, deportation and will never be allowed to return. If you are in this country illegally, self-deport NOW and preserve your opportunity to potentially return the legal, right way.

*See U.S. Dep't of Homeland Sec., DHS Announces It Will Forgive Failure to Depart Fines for Illegal Aliens Who Self-Deport Through the CBP Home App*, DHS (June 9, 2025), https://perma.cc/JC5Y-D2CE.

47.    This promise of exempting or forgiving immigration fines in exchange for self-

deportation was also offered directly to those immigrants subjected to these fines. Along with the Notice, Invoice, and Appeal Decision, noncitizens generally receive a generic advisal from DHS entitled "Self-Deport with CBP Home and Leave on Your Own Terms: Claim a Free Flight and $1,000 for EACH Member of Your Family." *See* Exhibit D, DHS Notice to Self-Deport ("Self-Deport Notice").

48.    Within this advisal, DHS lists three benefits of self-deporting, including "Forgiveness of Fines for Failure to Depart." *Id.* The Self-Deport Notice also included a warning: "If you do not self-deport, ICE will continue to prioritize your removal. This can include prosecution, detention, fines, and removal." *Id.*

49.    The Invoice generally sent by DHS[2] also outlines the requirements to avoid the fines "if you voluntarily depart the United States within ten (10) calendar days of this Invoice Date and confirm your departure with U.S. Immigration and Customs Enforcement, or through the CBP Home mobile applications."

**B.    DHS has the burden to establish willfulness in 274D agency proceedings**

50.    Unless a statute specifies otherwise, the APA puts the burden of proof on the party imposing a sanction. 5 U.S.C. § 556(d). Section 1324d is silent as to burden. DHS therefore bears the burden to establish all elements in this case.

51.    In order to assess the civil penalty at issue, it is DHS's burden to show that Doe "willfully" failed or refused to depart. 8 U.S.C. § 1324d(a)(1).

52.    The statutory term "willfully" is not defined within the INA as it pertains to Section 1324d.

---

[2] Doe did not actually receive an invoice, as is DHS's apparent policy in most other fines cases. A copy of at least one version of the boilerplate invoice can be found here: https://noimmigrationfines.org/wp-content/uploads/2025/08/240B-civil-fine-invoice-redacted-2025.pdf

53.     However, prior iterations of what is now the INA provide guidance as to how courts should interpret "willfulness" in this context. Under Section 20(c) of the Immigration Act of 1917, a noncitizen who had previously been ordered deported could be charged with "willful failure to depart from the United States" and subject to up to ten years of imprisonment. *See Heikkinen v. United States*, 355 U.S. 273, 274 (1958). In this context, the U.S. Supreme Court writing in 1958 stated that "[t]here can be no willful failure by a deportee, in the sense of 20(c) . . . in the absence of evidence, or an inference permissible under the statute, of a 'bad purpose' or '(non-)justifiable excuse,' or the like." *Id.* at 279.

54.     Willfulness is defined in many other contexts, and "is a 'word of many meanings whose construction is often dependent on the context in which it appears.'" *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 57 (2007).

55.     In its common usage, "willful" is defined as "done wittingly or on purpose, as opposed to accidentally or casually; voluntary and intentional, but not necessarily malicious. . . . A voluntary act becomes willful, in law, only when it involves conscious wrong or evil purpose on the part of the actor, or at least inexcusable carelessness, whether the act is right or wrong." *Willful*, Black's Law Dictionary (12th ed. 2024).

56.     Under Virginia criminal law—the law of the state where Doe lives—willfulness is defined as "knowing or intentional, rather than accidental," and "done without justifiable excuse, without ground for believing the conduct is lawful, or with a bad purpose." *Commonwealth v. Duncan*, 593 S.E.3d 210, 214 (Va. 2004).

57.     In the context of criminal tax cases, "willfulness" requires the Government to prove that the law imposed a duty on the defendant, that the defendant knew of this duty, and that he or they voluntarily and intentionally violated that duty. *Cheek v. United States*, 498 U.S. 192, 201

(1991); *see also Ratzlaf v. United States*, 510 U.S. 135, 138 (1994) ("stating that to give effect to the statutory 'willfulness' specification, the Government had to prove Ratzlaf knew the structuring he undertook was unlawful.").

58.    There are many circumstances where the fact that a person remains in the United States notwithstanding a removal order would not be willful—for example, situations where a removal order had been entered *in absentia*; an intervening change in circumstances such as a grant withholding of deportation or protection under the Convention Against Torture; and, under multiple definitions of "willful," any scenario in which the person lacked a "bad purpose" or "non-justifiable excuse" for remaining in the United States.

59.    Challenges to willfulness could apply to all or just part of the fine calculation period, i.e. even a person who willfully remained following issuance of a removal order may not have done so for the entire period alleged by the United States based on their circumstances. For example, a noncitizen subject to a removal order *in absentia* may not actually learn of that order for months, or even years.

60.    The foregoing definitions and standards of "willfulness"—including the requirements of knowledge, intent, and, in many cases, a "bad purpose"—apply with equal force to alleged violations of 8 U.S.C. § 1324d. This is particularly true given *Heikkinen*'s close factual similarities to the present day civil monetary penalty scheme and the lack of statutory guidance for how to interpret willfulness in this context.

61.    But under any definition, the Defendants here did not allege any specific facts to show that Doe willfully refused to leave notwithstanding a removal order. This is no surprise because the Defendants have intentionally designed a process through the IFR where willfulness is assumed or even "inferred" rather than proved. However, 8 U.S.C. § 1324d does not establish

strict liability, and the Defendants cannot excise the clear language of the statute through agency fiat.

**C.     The Fifth and Eighth Amendments Prohibit Excessive Fines Like the One Imposed Against Doe by the IFR**

      i.   <u>Penalties imposed under the IFR are a "fine" for Eighth Amendment purposes</u>

62.     "Protection against excessive punitive economic sanctions secured by the [Eighth Amendment's Excessive Fines Clause] is, to repeat, both 'fundamental to our scheme of ordered liberty' and 'deeply rooted in this Nation's history and tradition.'" *Timbs v. Indiana*, 586 U.S. 146, 154 (2019) (quoting *McDonald* v. *Chicago*, 561 U.S. 742, 767 (2010)).

63.     "The notion of punishment, as we commonly understand it, cuts across the division between the civil and the criminal law." *United States v. Halper,* 490 U.S. 435, 447–448 (1989). "Thus, the question is not [whether a fine under 8 U.S.C. § 1324d] is civil or criminal, but rather whether it is punishment." *Austin v. United States*, 509 U.S. 602, 610 (1993).

64.     With regard to civil penalties, the Supreme Court has explained that:

> [T]he determination whether a given civil sanction constitutes punishment in the relevant sense requires a particularized assessment of the penalty imposed and the purposes that the penalty may fairly be said to serve. Simply put, a civil as well as a criminal sanction constitutes punishment when the sanction as applied in the individual case serves the goals of punishment.

*United States v. Halper*, 490 U.S. 435, 448 (1989).

65.     Even a civil penalty which serves a remedial purpose may nevertheless be punishment if it also serves a punitive purpose, such as deterrence or retribution. *Id*.

66.     The IFR preamble explicitly states that the fines are meant to serve as a deterrent:

> This IFR is a critical part of DHS's efforts to use all statutorily available tools to achieve the Administration's immigration enforcement and border security objectives. This includes issuance of civil monetary penalties to encourage [noncitizens] to comply with removal orders and voluntary departure orders and **to**

**deter unlawful entries**. . . . In sum, DHS believes that faster processing and broader application of these penalties will more effectively deter illegal entry and [noncitizens] illegally remaining in the United States after agreeing to voluntarily depart or receiving an administratively final order of removal.

90 Fed. Reg. at 27446 (emphasis added).

67. The IFR preamble further states that the rule is in line with "the purpose of IIRIRA . . . to enhance immigration enforcement and the consequences of violating the nation's immigration laws. *Id.* at 27339.

68. In addition to the economically impossible amount of the fine itself, Defendant's own words clearly demonstrate that these fines are imposed by the IFR for deterrence and to impose "consequences." Those punitive purposes demonstrate that these fines are "fines" within the meaning of the Eighth Amendment.

      ii. <u>These fines are excessive as they are grossly disproportionate to the gravity of the alleged civil offense</u>

69. A financial assessment is "excessive" under the Eighth Amendment when it is "grossly disproportionate" to the gravity of the offense. *United States v. Bajakajian*, 524 U.S. 321, 334 (1998). The most often cited test in the Fourth Circuit distilling *Bajakajian's* gross disproportionality analysis is the four-factor test in *United States v. Jalaman*, 599 F.3d 347, 355–56 (4th Cir. 2010), that considers:

    a. the amount of the fine and its relationship to the authorized penalty;

    b. the nature and extent of the criminal activity;

    c. the relationship between the crime charged and other crimes; and

    d. the harm caused by the charged crime.

70. The lack of process or a record in this case leaves this Court nothing to review with respect to the last three factors of this test, nor does the IFR even contemplate that the agency

16

would or could build a record that would address these factors.

71.     However, before addressing the remaining *Bajakajian* factor, the amount of the fine and its relationship to the authorized penalty, it is first instructive to understand exactly how this huge fine will operate against low-income families such as Doe's.

72.     The Government has levied a fine of $1,852,352 against Doe. To put that in perspective, the annual gross wages of a person making the Virginia minimum wage of $12.77 are $26,561.60 per year. *See* Va. Code § 40.1-28.10(F); Virginia Dept. of Labor and Industry, *Virginia Minimum Wage Rate Increasing Effective January 1, 2026*, available at https://doli.virginia.gov/2025/07/29/virginia-minimum-wage-rate-increasing-effective-january-1-2026 (last accessed May 17, 2026). If a person making minimum wage applied 100% of their earnings each month towards this fine, it would take them just under 70 years to pay the entire amount.

73.     Of course, 70 years is a <u>gross</u> underestimate, because the initial balance is subject to interest and penalties. As for interest, debts owed to the federal government accrue interest at a rate not lower than established by the Current Value of Funds Rate (CVFR). 31 U.S.C. § 3717(a)(1); 31 CFR § 901.9(a)-(b). For debts assessed in 2026, the CVFR is 4%.[3]

74.     With a 4% interest rate and a principal amount of $1,852,352, the minimum monthly payment that would cover sufficient interest to pay off even the most minimal principal is $6,174.52.[4] Yearly, this amounts to $74,094.24, which is 224% of federal poverty guidelines for a family of four. *Annual Update of the HHS Poverty Guidelines*, 91 Fed. Reg. 1797 (Jan. 15, 2026).

---

[3] Bureau of the Fiscal Service, *Current Value of Funds Rate*, available at https://fiscal.treasury.gov/payments-from-government/reports-statements/current-value-of-funds (last accessed May 15, 2026)
[4]  Interest   calculations   courtesy   of   the   Bret   Whissel   Amortization   Calculator,   available   at https://bretwhissel.net/amortization/

75.    At this minimal rate, with the minimum possible interest amount, it would take over 326 years to pay off the debt by paying 100% of household income, with the total amount paid ultimately reaching $19,264,502.40. Notably, 326 years is approximately 413.5% of the average life expectancy averaged across gender in the United States as of 2024.[5] Assuming a more realistic working life of 49 years, i.e. age 18 to the current Social Security retirement age of 67 years, monthly payments would be somewhat higher at $7,190.23, or $86,282.76 annually.

76.    Of course, J. Doe is 36 years old, not 18. Recalculating payments based on their remaining 31 working years until age 67, Doe would have to pay $8,696.26 each month to repay the debt assessed against them. That amounts to $104,355 each year, for over three decades, or $3,235,005 in total.

77.    Unfortunately, this is still an underestimate of the actual financial impact. Current law also requires agencies to charge a penalty of up to 6% a year on balances more than 90 days old. 31 U.S.C. § 3717(e)(2). As relevant here, penalties are calculated as a percentage of both principal and accrued interest. *See* 31 C.F.R. § 901.9(d); *see also* Bureau of the Fiscal Service, *Federal Non-Tax Debt Treatise Part II: Elements of a Federal Nontax Debt*, pg. 52, https://fiscal.treasury.gov/system/files/files/debt-management/debt-treatise-partII.pdf (Feb. 2023). Taken together, the 4% interest rate and 6% penalty rate effectively operate as a nominal APR of 9.79%.

78.    With this much higher effective rate, the minimum payment to pay any principal at all becomes $15,112.12 per month, with the full balance being paid off in 141.83 years after a total of $25,720,828.24 in payments. Once again starting from a more reasonable assumption of 31

---

[5] Jiuqan Xu, *et al.*, *Mortality in the United States, 2024*, Center for Disease Control, available at https://www.cdc.gov/nchs/data/databriefs/db548.pdf (last accessed May 8, 2024).

remaining working years for Doe, this amount becomes $15,885 per month, $190,620 per year, and a total of $5,909,220 paid through the life of the debt.

79.    Of course, all of the forgoing assumes 100% of gross earnings are paid to the debt. In reality, people must also pay for rent, food, medicine, taxes, transportation, childcare, clothing, and basic cleaning supplies.

80.    While there are many models for quantifying the actual cost of living in the United States, perhaps the best model in wide and long-term use is the model employed by the Internal Revenue Service (IRS) for the collection of individual taxes. The IRS uses annually updated data to determine allowances for necessary expenses, called "collection financial standards."[6] Some of these standards are the same across the country, such as food, household supplies, and clothing. IRM 5.15.1.9. Others are tuned to the region, such as transportation, or tuned to the county, such as housing costs and utilities. IRM 5.15.1.10.

81.    Using the IRS Collection Standards as an evidence-based estimation for the costs of living for a household of four living in the Washington D.C. Metropolitan Area, the following are standard costs of living as of April 2025:

    a.  Food, housekeeping supplies, apparel & services, personal care and services, and miscellaneous expenses – **$2,129**.[7]

    b.  Housing and utilities – **$4,041**.[8]

---

[6] See generally https://www.irs.gov/businesses/small-businesses-self-employed/collection-financial-standards
[7] Internal Revenue Service, *National standards: Food, clothing and other items*, available at https://www.irs.gov/businesses/small-businesses-self-employed/national-standards-food-clothing-and-other-items
[8] Internal Revenue Service, *Virginia - Local standards: Housing and utilities*, available at https://www.irs.gov/businesses/small-businesses-self-employed/virginia-local-standards-housing-and-utilities

    c.   Transportation – **$957**.[9]

    d.   Out-of-pocket healthcare -- $336.[10]

    e.   Total – $7,143

82.    Added to the $15,885 payment necessary to pay the entire balance of fine plus interest and penalties within 31 years, this brings Doe's total monthly obligation to $23,348. However, Doe must also pay the Government for something else – their tax obligations. If Doe paid both their basic living expenses and a payment that would pay off the full balance of their fine over a period of 31 years, their gross pay would need to be approximately $35,354.57 each month, or $424,254.84 annually.[11]

83.    This amount is 1,286% of 2026 Federal Poverty Guidelines, and would exceed estimated median income for a household of four in Virginia, which is $144,826.[12] $424,254.84 is also just shy of at least one estimate of the top 1% of earners in the United States circa 2025.[13]

84.    All of this amounts to one inescapable conclusion—this fine is designed to be hopelessly unpayable by the class of people to whom it is assessed, and to strike the coercive financial pressure designed to compel self-departure to families like Doe's.

        iii.   <u>These fines are excessive compared to federal criminal fines</u>

85.    Due to the nonexistent record in this case, as constrained by the process required by the IFR, the only *Bajakajian* factor that this Court has enough information to evaluate is the

---

[9] Internal Revenue Service, *Local standards: Transportation*, available at https://www.irs.gov/businesses/small-businesses-self-employed/local-standards-transportation. Note: this assumes ownership and operation of a single vehicle for the Washington, D.C. MSA.

[10] Internal Revenue Service, *National standards: Out-of-pocket health care*, available at https://www.irs.gov/businesses/small-businesses-self-employed/national-standards-out-of-pocket-health-care.

[11] ADP, *Gross Pay Calculator*, available at https://www.adp.com/resources/tools/calculators/gross-pay-calculator.aspx

[12] U.S. Dept. of Justice, *Census Bureau Median Family Income By Family Size*, available at https://www.justice.gov/ust/eo/bapcpa/20260401/bci_data/median_income_table.htm.

[13] Income by State: Statistics and Percentile Calculator, available at https://dqydj.com/income-by-state/.

first factor – "the amount of the fine and its relationship to the authorized penalty[.]" However, the oppressively large amount of these fines lend so much weight to this factor as to render it dispositive.

86.    In addition to other factors, the Supreme Court's analysis in *Bajakajian* requires that the amount of a fine not be "grossly disproportional to the gravity of the… offense[.]" This analysis almost always involves comparing a civil fine, penalty, or forfeiture [14] with the corresponding criminal fine. [15] *See, e.g., Bajakajian*, 524 U.S. at 336-337; *United States v. Blackman*, 746 F.3d 137, 143-144 (4th Cir. 2014) (analyzing whether a criminal forfeiture was excessive by comparing it to the corresponding criminal fine); *U.S. ex rel. Bunk v. Gosselin World Wide Moving, N.V.*, 741 F.3d 390, 408 (4th Cir. 2013) ("[t]he amount of the [fine] must bear some relationship to the gravity of the offense that it is designed to punish." (*quoting Bajakajian*, 524 U.S. at 334)). With or without interest and penalties, the fine imposed by DHS dwarfs maximum fine amounts that can be imposed in the vast majority of federal criminal matters.

87.    In the context of criminal willful failure to depart, categorized as a felony, this same maximum limit of $250,000 also applies. *See* 18 U.S.C. § 1253(a) (imposing fines "under Title 18[,]" implying the default structure for fines at 18 U.S.C. § 3571 is to be used). There is no statutory minimum fine for criminal willful failure to depart.

88.    However, in fines assessed in connection with criminal convictions, statute and the

---

[14] Many, but not all, subsequent circuit precedent citing *Bajakajian* and *Timbs* has primarily dealt with criminal forfeiture. Forfeiture is distinct from the civil penalty at issue in more than one way. For example, criminal forfeiture is a consequence of a conviction, which can only occur in the more protective framework of constitutional rights available to defendants in criminal proceedings. As addressed in Section D below, while the amount of the fine dwarfs criminal fines for far more serious offenses, the process established by the IFR fails to meet even a civil standard of due process.

[15] Forfeiture also involves a government taking of property that the target already possesses. As explained above, Doe possesses almost nothing, now or at the time they were assessed the fine, and has no hope of ever paying even a substantial portion of the accruing interest on their endless debt, let alone the principal.

Eighth Amendment alike require fines to be tailored at least to some degree based on the person's ability to pay. 18 U.S.C. § 3752(a) (sentencing court must consider factors including "the defendant's income, earning capacity, and financial resources" and "the burden that the fine will impose upon the defendant [and dependents]."). Imposition of fines, especially at the statutory maximum, must be supported by factual findings on the record. *See United States v. Deritis*, 137 F.4th 209 (4th Cir. 2025)*, cert. denied*, 146 S. Ct. 270 (2025).

89.    Criminal fines can also be modified or corrected. 18 U.S.C. §§ 3573 and 3742. There does not appear to be any similar measure that would allow for modification or correction of a fine amount assessed under 8 U.S.C. § 1324d or the IFR.

90.    The only fines that can be levied in the federal criminal system with a theoretical maximum more than that assessed against Doe here involve matters such as organized crime, very serious drug trafficking offenses, serious fraud and financial crimes, and the most serious of terrorism-related offenses. *See, e.g.,*18 U.S.C. § 2332g (missile systems designed to destroy aircraft); 18 U.S.C. § 2332h (radiological dispersal devices); 21 U.S.C. § 848(a) & (b) (ongoing criminal enterprise); 21 U.S.C. § 960(b)(3) (certain aggravated felony drug offenses); or 18 U.S.C. § 3571(d) (twice the gross gain or loss, in situations where there is pecuniary gain to the defendant or pecuniary loss).

91.    In contrast, the alleged conduct here does not even begin to approach the gravity of any of these very serious crimes, even if the Respondents had met their burden to prove those allegations – which they have not.

> iv.    The excessiveness of these fines also violates substantive due process under the fifth amendment

92.    In addition to the Eighth Amendment, the Fifth Amendment "Due Process Clause imposes limits on 'grossly excessive' monetary penalties that go beyond what is necessary to

vindicate the government's 'legitimate interests in punishment and deterrence.'" *U.S. ex rel. Drakeford v. Tuomey*, 792 F.3d 364 (4th Cir. 2015) (applying by analogy fifth amendment excessive fines analysis from civil punitive damages awards to civil penalties under the False Claims Act) (*quoting BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 562 (1996).

93.    In the context of punitive damages awarded by a jury or to the Government pursuant to the False Claims Act, the Fourth Circuit has laid out the following test to determine excessiveness under the Fifth Amendment:

> The Supreme Court has instructed courts to consider three guideposts when reviewing punitive damages awards under the Due Process Clause: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.

*Tuomey*, 792 F.3d at 388.

94.    The nonexistent record in this case does not speak to any of these factors. Nor could it, as the process laid out by the IFR does not contemplate gathering or analyzing information to support minimizing a fine such as the one at issue here. And yet, the sheer amount of the fine and absence of any consideration of these factors demonstrates that the fine, imposed as required by IFR, is "grossly excessive" and thus a deprivation of Doe's right to substantive due process.

**D.    The Constitution Guarantees Procedural Due Process**

95.    The IFR, as written and as implemented here, denies procedural due process because it fails to provide adequate notice, fails to provide the opportunity to be heard at a meaningful time and in a meaningful manner, and fails to provide a neutral arbiter.

        i.    Due process requires adequate notice

96.    "An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to

apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950).

97.    Under *Mullane*, notice can be constitutionally defective if either the method of service or the content of the notice is inadequate. In terms of method of service, it "must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it." *Id.* at 315. With respect to content, "the notice must be of such nature as reasonably to convey the required information." *Id.* at 314. Here, the IFR fails to provide adequate notice in terms of both method and content.

98.    The method of service required by the IFR does not constitute adequate notice. Under the IFR, DHS is no longer required to issue and personally serve a Notice of Intent to Fine, as it was under the prior regulatory framework. 90 Fed. Reg. at 27449. Nor is DHS required to wait for any responses from a noncitizen prior to issuing a decision. *Id.* Rather, the IFR requires only that an immigration officer initiate the process by issuing a document entitled "Notice of Violation and Order Under the Immigration and Nationality Act." *Id.* The default method of service is ordinary mail. *Id.* at 27452. Ordinary mail carries no confirmation of delivery, no return receipt, and no mechanism for the sender to learn that the recipient never received the notice. This is especially problematic in the immigration enforcement context, where individuals may be detained, transferred between facilities, or otherwise unable to receive mail at their last-known address through no fault of their own.[16]

---

[16] It is also unclear where DHS obtains the addresses for noncitizens whom it fines. Without more information regarding DHS's process for obtaining and verifying addresses, it is not clear that DHS is acting reasonably in its attempt to provide notice of the fines. *Cf Snider Int'l Corp. v. Town of Forest Heights, Md.*, 739 F.3d 140, 146–47 (4th Cir. 2014) ("Through their designated agencies, Appellees mailed summonses to the addresses registered in connection with the recorded vehicles. It is difficult to imagine a more reasonable attempt at effectuating actual notice of a driving infraction than the use of registration information collected by the state's transportation agency, the Maryland Motor

99.      In the preamble to the IFR, DHS claims that "using ordinary mail for these civil monetary penalties . . . is reasonably calculated to apprise [noncitizens] of the fine and that any additional benefits of certified mail are outweighed by its costs and DHS's interest in applying these penalties swiftly and at scale." 90 Fed. Reg. at 27452. However, *Mullane* does not contemplate a balancing test. Rather, *Mullane* requires that the notice "apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane*, 339 U.S. at 314. While delivery by mail can be a constitutionally sufficient method of providing notice, *see Snider Int'l*, 739 F.3d at 146, this method of notice for Doe is insufficient given the nature of the interest at stake and the short time period to respond.

100.      As DHS acknowledges, "civil monetary penalties can involve significant fines, particularly for [noncitizens] who fail to depart the United States after a removal order," as is the case for Doe. 90 Fed. Reg. at 27451. DHS compares this interest to the "modest" and "more limited" fines that other noncitizens might be subject to. *Id.* DHS is right to highlight the significant nature of the interest at stake; the fine Doe is subject to amounts to a permanent deprivation of property, given that there are no statute of limitations and the fine is functionally unpayable. Given the nature of the interest at stake, more than ordinary mail is needed here. Additionally, given the short time––only 15 days—for Doe to file an appeal, ordinary mail is insufficient.

101.      Furthermore, the method of notice provided by the IFR is insufficient because the notice is only in English and includes no translation. Given that the fines at issue here relate to immigration violations, an English-only document with no translation is not "of such nature as reasonably to convey the required information." *Mullane*, 339 U.S. at 314; *see Covey v. Town of*

Vehicle Administration ("MVA"). By using these records, the citations were sent to what was likely to be the most current address for the registered owner.").

*Somers*, 351 U.S. 141, 146–47 (1956) (holding that mailed notice to a person whom the government knew to be mentally incompetent was constitutionally insufficient because the government was aware that, as a consequence of the incompetence, the mailing did not actually provide notice).

102.    The content of the Notice of Violation and Order issued by DHS also constitutes constitutionally insufficient notice. Under the IFR, the Notice of Violation and Order contains minimal, generic allegations that are selected by DHS via checking a box. There is no space for any officer to indicate the basis for those allegations. There is no itemization or predicate information to show how the fine, which by statute is a per-day charge, was actually calculated.

103.    A form document consisting of a series of pre-printed checkboxes, with no individualized analysis of the specific facts or circumstances of the recipient's case, does not constitute "notice reasonably calculated . . . to apprise" the recipient of what is being proposed or what they must do in response. There is no individualized, specific information to allow the recipient to understand the basis for the government's action and mount a meaningful defense or objection. *See Farabee v. Clarke*, 967 F.3d 380 (4th Cir. 2020) (state probationer stated a plausible due process claim in habeas, alleging that he did not receive actual notice of charges against him at probation revocation proceeding due to breakdown in communication with his counsel, and was misled into thinking he would be defending other alleged misconduct).

     ii. <u>Due process requires being heard at a meaningful time and in a meaningful manner</u>

104.    "Parties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified. It is equally fundamental that the right to notice and an opportunity to be heard 'must be granted at a meaningful time and in a meaningful manner." *Fuentes v. Shevin*, 407 U.S. 67, 80 (1972).

105.    At a minimum, "the fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quotation omitted). In general, to determine whether the basic requirements of due process have been met, a court must weigh:

- the private interest that will be affected by the official action;

- the risk of an erroneous deprivation of such interest through the procedures used, and probable value, if any, of additional procedural safeguards; and

- the Government's interest, including the fiscal and administrative burdens that the additional or substitute procedures would entail.

*Id.* at 335.

106.    As for the first *Mathews* factor, Doe's private interest in retaining their property, including garnished wages or tax refunds, is substantial. The Supreme Court has frequently recognized the that a person's means of livelihood is a protectable property interest. *See Fusari v. Steinberg*, 419 U.S. 379, 389 (1975); *Goldberg v. Kelly*, 397 U.S. 254, 264 (1970); *Sniadach v. Family Finance Corp.*, 395 U.S. 337, 340 (1969).  Moreover, Doe's interest is not confined to the loss of property resulting from imposed immigration fines. Rather, the private interest extends to any future dollar, asset, or piece of nonexempt property that Doe ever acquires. Since there is no statute of limitations for collection of these fines, the interest at stake is both prospective as well as immediate. Additionally, given the unpayable nature of Doe's fine—Doe's gross pay would need to be approximately $35,354.57 monthly to pay off the fine over 31 years—Doe will remain indebted for their entire life. As DHS acknowledges in the preamble, the penalty can "involve significant fines." 90 Fed. Reg. at 27451.As for the second *Mathews* factor, given the minimal procedures of the IFR, the risk of an erroneous deprivation of Doe's private interest is high. There

are significant deficiencies in the IFR, including (1) limited time to file a written notice of appeal, (2) inability to access the evidentiary record, (3) reversed burden of proof, (4) no guaranteed response to DHS's reply, (5) insufficient time to respond, if provided the opportunity, given the incredibly short 45-day window, (6) no opportunity to confront witnesses, and (7) no opportunity for oral arguments. Additional safeguards would mitigate the risks of erroneous deprivation.

107.    First, the IFR provides a noncitizen with only 15 business days to file a written notice of appeal to DHS. *See* 90 Fed. Reg. at 27450. Such incredibly short timelines have no basis in statute. Under the second *Mathews* factor, such a limited timeframe to contest the fine results in a significant risk of erroneous deprivation. Even a slight increase in the amount of time allotted to appeal could significantly decrease the risk of error, because it would allow for more time to gather documents and prepare a defense.

108.    Second, the IFR risks erroneous deprivation because it fails to afford access the evidentiary record. The Notice states that, if requested on appeal, "the supervisory immigration officer shall provide copies of pertinent documentation and records relevant to the penalty." <u>*See*</u> <u>Exhibit A</u>. However, neither the Notice nor the IFR provides any timeline for the provision of documents by DHS. The Notice does, however, provide for a very quick decision window. *Id.* (providing for review of a noncitizen's appeal within 10 days after the notice of appeal was filed, and a final decision no later than 45 calendar days after the notice of appeal was filed). This means that, even if the pertinent documentation were provided by DHS, the window of time for the noncitizen to respond is too short to meaningfully examine and utilize the record provided.

109.    J. Doe explicitly requested on appeal any and all documentation and records relevant to the penalty. <u>*See* Exhibit B, Opposition</u>. Despite this, DHS did not provide a single document.

110.     In addition, the IFR impermissibly reverses the burden of proof, which belongs to DHS by virtue of the APA. 5 U.S.C. § 556(d). Noncitizens are required to submit their own documentary evidence before getting documents from DHS. *See* 8 C.F.R. § 281.1(e)(1). And they are not guaranteed the opportunity to reply to the government's response to the appeal. Instead, they can only file additional documents "in the officer's discretion." 8 C.F.R. § 281.1(e)(1). Such a reversal of the burden of proof makes the risk of erroneous deprivation unreasonably high.

111.     The IFR also provides no opportunity for a noncitizen to confront witnesses, which is required in administrative proceedings imposing significant penalties. *See Goldberg v. Kelly*, 397 U.S. 254, 269 (1970) ("In almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses."). Whether the direct confrontation and the right to cross-examine one's accusers are requisites of procedural due process in a given case depends upon the balancing of the particular individual interest involved with the countervailing state interests. *See Bos. v. Webb*, 783 F.2d 1163, 1166–67 (4th Cir. 1986) (citing *Mathews v. Eldridge,* 424 U.S. 319 (1976)).

112.     The IFR also risks erroneous deprivation because it fails to provide a contemporaneous opportunity for oral argument. Rather, the IFR affords only a "paper hearing," i.e. review of documents. The Supreme Court explained in *Goldberg v. Kelly* how paper hearings may be insufficient, stating that:

> It is not enough that a welfare recipient may present his position to the decision maker in writing or second-hand through his caseworker. Written submissions are an unrealistic option for most recipients, who lack the educational attainment necessary to write effectively and who cannot obtain professional assistance. Moreover, written submissions do not afford the flexibility of oral presentations; they do not permit the recipient to mold his argument to the issues the decision maker appears to regard as important. Particularly where credibility and veracity are at issue, as they must be in many termination proceedings, written submissions are a wholly unsatisfactory basis for decision.

*Goldberg v. Kelly*, 397 U.S. at 268–69.

113.    Portions of the IFR make clear that DHS foreclosed the possibility of a noncitizen successfully appealing a fine, demonstrating that DHS has not seriously grappled with the risk of erroneous deprivation. *See* 90 Fed. Reg. at 27443 ("[T]he [noncitizen]'s immigration court records will typically demonstrate that the [noncitizen] was aware of the obligation to depart the United States and, when combined with the [noncitizen]'s failure to do so, will ordinarily raise a *sufficient inference* that the [noncitizen] willfully or voluntarily[sic] failed to depart.") (emphasis added). The conclusory nature of these statements makes it evident that DHS assumes no noncitizen will be able to successfully appeal the imposed fine. This language, coupled with the generic check-box response in Form 281-A, demonstrates that the limited procedural protections promised by the IFR are nothing more than illusory.

114.    With respect to the third *Mathews* factor, the Government's stated interest is in imposing more fines more quickly in order to help deter future unlawful entries. 90 Fed. Reg. at 27442. But this goal would not be impaired by providing additional procedural safeguards. Nor would additional procedural safeguards result in unreasonable administrative or fiscal burdens on the government. Due process requires a neutral adjudicator

115.    An impartial decisionmaker is an essential element of due process. *See Bowens v. North Carolina Department of Human Resources*, 710 F.2d 1015, 1020 (4th Cir. 1983) (citing *Goldberg v. Kelly*, 397 U.S. at 271).

116.    Prior to the IFR, the regulatory system authorized a DHS employee who has reason to believe that a noncitizen is subject to a civil monetary penalty under the INA to serve the noncitizen with a Notice of Intention to Fine (NIF). 90 Fed. Reg. at 27441. Thereafter, the noncitizen had a 30-day period to respond to the NIF. *Id.* If requested, a personal interview would

be held where the noncitizen could present any evidence in opposition to the civil penalty. *Id.* From there, an immigration officer would prepare a report summarizing any information, documents, and statements that the noncitizen provides in support of why the penalty should not be imposed. *Id.* This immigration officer would also provide a recommendation and submit their report and recommendation to the appropriate deciding official for review, who would then determine whether to sustain the immigration officer's recommended decision and decide whether a penalty would be issued. *Id.*

117.    The IFR has gutted the modest protections of the previous system. Now, under the IFR, a noncitizen has only 15 business days to file a written notice of appeal to DHS. 8 CFR 281.1(e)(1). If a noncitizen appeals, a supervisory immigration officer who did not issue the initial Notice will review the noncitizen's appeal within 10 days of receiving the appeal. *Id.* (e)(2). There is no longer an option for the noncitizen to request an in-person interview. *Id.* This officer's decision after de novo review of the record is the final agency action. 90 Fed. Reg. at 27450.

118.    The IFR provides no neutral adjudicator at any stage before the penalty issues. Firstly, the IFR creates no division between the charging officer and the adjudicating officer. In other words, the officer who determines that a violation occurred and checks the boxes on the Notice is effectively making the adjudicative determination, with no independent review by a neutral officer before the penalty is issued.

119.    Additionally, the document issued to initiate the process ("the Notice") is both a notice *and* an order. This further underscores that no neutral decisionmaker has ever evaluated the merits of the violation before the deprivation occurs. While a separate DHS officer is supposed to review the fine on appeal, that officer is still within the same enforcement apparatus as the initial officer.

120.    While it is true that there is a presumption that governmental officials can and will decide particular controversies conscientiously and fairly despite earlier involvement in their investigation, this presumption can be overcome by demonstrations of "extrajudicial" bias stemming from other influences than the investigative involvement. *Withrow v. Larkin*, 421 U.S. 35, 55 (1975); *Morris v. City of Danville*, 744 F.2d 1041, 1044 (4th Cir.1984).

121.    Under the IFR, the same enforcement agency investigates the alleged violation, determines liability, issues the penalty, adjudicates the appeal, controls access to evidence, and retains institutional incentives favoring rapid penalty issuance.

122.    The statutory scheme at play in the IFR raises concerns of extrajudicial bias because "the probability of actual bias on the part of the judge or decisionmaker" is "too high to be constitutionally tolerable." *See Withrow v. Larkin*, 421 U.S. at 47. DHS officials' extrajudicial bias in issuing these fines is clear from press releases and public comments made by the Secretary and other government officials. DHS widely publicizes its rates of deportation in order to secure additional funding and support from the public, and DHS has explicitly stated that the purpose of the immigration fines is to encourage individuals to self-deport. These well-documented biases demonstrate why the combination of investigative and adjudicative functions in the IFR necessarily creates an unconstitutional framework. *See Marshall v. Cuomo*, 192 F.3d 473, 484 (4th Cir. 1999) (evaluating whether HUD hearing officer acted with bias in violation of Fifth Amendment due process rights).

E.    **The *Accardi* Doctrine Requires Agencies to Follow Their Own Regulations and Policies**

123.    Under the "Accardi doctrine," when the government has promulgated "[r]egulations with the force and effect of law," those regulations "supplement the bare bones" of federal statutes, such that the agencies are bound to follow their own "existing valid regulations."

*United States ex rel. Accardi v. Shaghnessy*, 347 U.S. 260, 266-268 (1954). "[W]hen an agency fails to follow its own procedures or regulations, that agency's actions are generally invalid." *Nader v. Blair*, 549 F.3d 953, 962 (4th Cir. 2008) (citing *Accardi*, 347 U.S. at 268).

124.   Here, DHS failed to comply with its own regulations implemented to protect the due process rights of people like Doe such that the imposition of a monetary civil penalty under Section 1324d violated their procedural due process rights and must be set aside under *Accardi*.

125.   First, at the time that Doe's removal order was allegedly issued, 8 C.F.R. 280 governed the imposition of civil fines under 8 U.S.C. 1324d. Under *Accardi*, DHS was thus required to follow the procedural requirements codified pre-IFR, which attached when the removal order was issued. This is because application of the new regulation to Doe results in an impermissible retroactive effect. A "retroactive effect" is one that would "'would impair rights [Doe] possessed when he acted, increase [Doe's] liability for past conduct, or impose new duties with respect to transactions already completed.'" *Fernandez–Vargas v. Gonzales*, 548 U.S. 30, 37 (2006) (quoting *Landgraf v. USI Film Prods.*, 511 U.S. 244, 280 (1994)). DHS cannot eliminate the procedural rights guaranteed by 8 C.F.R. 280 by merely promulgating a new regulation after the fact.

126.   Even assuming that the IFR applies to the imposition of Section 1324d to Doe, DHS failed to comply with one of the only procedural protections afforded by the IFR. *See* 8 C.F.R. § 281.1(e). Namely, the IFR provides that, after a timely notice of appeal, a supervisory immigration officer will review the initial decision and "will also provide the [noncitizen] with copies of pertinent documents and records relevant to the penalty, if the [noncitizen] requests, unless they are law enforcement sensitive, or disclosure is prohibited by law." 90 Fed. Reg. at 27450 (emphasis added).

127.    Here, Doe filed a timely notice of appeal which explicitly requested pertinent documents and records. Exh. B. Yet DHS ignored this request, did not provide records, and gave no reason for the lack of disclosure or of adherence to their own rules. *See* Exhibit C, Appeal Decision.

128.    Even if DHS had complied with this request and provided the requested records, Doe would not have had enough time to incorporate them into their appeal. The IFR provides no timeframe for the provision of records, and Doe only had 15 days to submit their appeal. Failure to provide requested records without enough time to integrate them into an appeal renders the record provision meaningless and is a separate *Accardi* violation.

129.    Additionally, under the IFR, the initiation of the fine is supposed to "include a brief statement of the reasons for the decision." *See* 8 CFR 281.1(c)(1). This requirement ensures that the noncitizen "understands the basis for the penalty and has the requisite information in the event that the [noncitizen] seeks to challenge the immigration officer's decision." 90 Fed. Reg. at 27449.

130.    Yet DHS failed to follow these procedures by failing to provide even a minimal opportunity for Doe to understand the evidentiary basis or reasoning of the fines imposed. Instead, the Notice merely checks off a series of generic boxes. *See* Exhibit A.

## CLAIMS FOR RELIEF

### COUNT I: VIOLATION OF THE APA, 5 U.S.C. § 706(2)(B)
**(Contrary to constitutional right, power, privilege or immunity – Excessive fines under the Eighth Amendment)**

131.    The preceding paragraphs are incorporated by reference.

132.    The Eighth Amendment prohibits excessive fines.

133.    The debt assessed against Doe in this case is a fine under the meaning ascribed in the Eighth Amendment. As evidenced by the language of the Defendants in promulgating and

executing the IFR, as well the sheer amount of the debt, it is punitive in nature.

134.    The fine is excessive because it is grossly disproportionate to the offense alleged, even if it had been proven.

135.    The Court should hold unlawful, vacate, and set aside the fine as contrary to Doe's constitutional rights under the Eighth Amendment of the U.S. Constitution. 5 U.S.C. § 706(2)(B).

136.    The Court should declare that 8 U.S.C. § 1324d, as interpreted by the IFR, is constitutionally void as a violation of the Eighth Amendment's prohibition against excessive fines.

137.    As a direct and proximate result of Defendants' wrongful conduct, Doe has suffered and will continue to suffer substantial and irreparable harm. They require injunctive relief to prevent continued and future irreparable injury.

### COUNT II: VIOLATION OF THE APA, 5 U.S.C. § 706(2)(B)
**(Contrary to constitutional right, power, privilege or immunity – Excessive fines as a violation of substantive due process under the Fifth Amendment)**

138.    The preceding paragraphs are incorporated by reference.

139.    The Fifth Amendment prohibits "grossly excessive" fines as a violation of substantive due process.

140.    The fine at issue here is grossly excessive, not only on Eighth Amendment grounds, but also as a denial of substantive due process under the Fifth Amendment.

141.    The Court should hold unlawful, vacate, and set aside the fine as contrary to Doe's constitutional rights under the Fifth Amendment of the U.S. Constitution. 5 U.S.C. § 706(2)(B).

142.    The Court should declare that 8 U.S.C. § 1324d, as interpreted by the IFR, is constitutionally void as a violation of the Fifth Amendment's guarantee of substantive due process.

143.    As a direct and proximate result of Defendants' wrongful conduct, Doe has

suffered and will continue to suffer substantial and irreparable harm. They require injunctive relief to prevent continued and future irreparable injury.

## COUNT III: VIOLATION OF THE APA, 5 U.S.C. § 706(2)(B)
### (Contrary to constitutional right, power, privilege or immunity – Procedural Due Process)

144.    The preceding paragraphs are incorporated by reference.

145.    Neither the initial Notice, nor any subsequent notices issued by Defendants, reasonably apprised Doe of the action or afforded them a viable opportunity to present their objections.

146.    The procedure for determining fines as laid out in the IFR failed to accord Doe with basic procedural due process.

147.    The new process mandated by the IFR fails to provide for a neutral arbiter, and thus deprived Doe of the opportunity for a meaningful hearing at a meaningful time.

148.    The Court should hold unlawful, vacate, and set aside the fine as contrary to Doe's constitutional rights under the Fifth Amendment of the U.S. Constitution. 5 U.S.C. § 706(2)(B).

149.    As a direct and proximate result of Defendants' wrongful conduct, Doe has suffered and will continue to suffer substantial and irreparable harm. They require injunctive relief to prevent continued and future irreparable injury.

## COUNT IV: VIOLATION OF THE APA, 5 U.S.C. § 706(2)(A), (B), & (D)
### (Arbitrary and capricious, contrary to constitutional right, power, privilege or immunity, and without observance of procedure required by law – Violation of Due Process, 8 C.F.R. § 281.1, & *Accardi* Doctrine – Failure to provide access to agency record)

150.    The preceding paragraphs are incorporated by reference.

151.    Under the *Accardi* doctrine, when an agency fails to follow its own procedures or regulations, that agency's actions are generally invalid. *See Nader v. Blair*, 549 F.3d at 962.

152.    The IFR, 8 C.F.R. § 281.1(e), requires DHS to provide the documentary basis of

their decision if the person facing the fine so requests.

153.    Doe made a request in their appeal, invoking 8 C.F.R. § 281.1(e). <u>Exhibit B, Opposition</u>. DHS didn't even acknowledge that the request was made. <u>Exhibit C, Appeal Decision.</u>

154.    Defendants also failed to follow their own procedures with regard to a critical process in establishing the debt, i.e. providing Doe even a minimal opportunity to understand the evidentiary basis of the fine they have imposed.

155.    This is grounds for reversal of the agency decision imposing the fine.

156.    As a direct and proximate result of Defendants' wrongful conduct, Doe has suffered and will continue to suffer substantial and irreparable harm. They require injunctive relief to prevent continued and future irreparable injury.

**COUNT V: VIOLATION OF THE APA, 5 U.S.C. § 706(2)(A)**
**(Action Not in Accordance with Law – Failure to prove willfulness)**

157.    The preceding paragraphs are incorporated by reference.

158.    The Administrative Procedure Act, 5 U.S.C. § 706(2)(B), provides that courts "shall . . . hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

159.    Under 8 U.S.C. § 1324d(a) and 5 U.S.C. § 556(d), the government must prove "willfulness."

160.    Defendants took no steps to conduct and individualized assessment of whether Doe's continued presence is willful and did not even attempt to meet their burden to prove that Doe has willfully failed or refused to depart the United States pursuant to a final order of removal.

161.    Defendants' minimal, boilerplate process failed to establish that Doe acted with the requisite willfulness. Because willfulness is a necessary element of the statute, and Defendants failed to carry the burden of proof, the imposition of the fine is not in accordance with the law.

162.     The Court should hold unlawful, vacate, and set aside the fine as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(B).

163.     As a direct and proximate result of Defendants' wrongful conduct, Doe has suffered and will continue to suffer substantial and irreparable harm. They require injunctive relief to prevent continued and future irreparable injury.

**COUNT VI: VIOLATION OF THE APA, 5 U.S.C. § 706(2)(A)**
**(Arbitrary and Capricious – Failure to Conduct Individualized Determination)**

164.     The preceding paragraphs are incorporated by reference.

165.     Defendants assessed the fine without evidence, and without even making specific allegations regarding Doe's willful failure or refusal to depart.

166.     The fine is arbitrary and capricious because, among other things, it is not supported by reasoned decision-making, and fails to consider the statutory factors for imposing a penalty under 8 U.S.C. § 1324d(a).

167.     In addition to failure to prove willfulness, Defendants have not even attempted to allege let alone meet their burden to prove additional elements, such as how the amount alleged due was calculated, from when the debt began to accrue, or even the existence and nature of the alleged removal order.

168.      The Court should hold unlawful, vacate, and set aside the fine as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(B).

169.     As a direct and proximate result of Defendants' wrongful conduct, Doe has suffered and will continue to suffer substantial and irreparable harm. They require injunctive relief to prevent continued and future irreparable injury.

**PRAYER FOR RELIEF**

Plaintiff respectfully requests that this Court:

a. Hold unlawful and set aside the Defendants' Notice;

b. Temporarily and permanently enjoin Defendants from collecting the fine from Plaintiff or otherwise giving the fine any legal or practical effect;

c. Declare the IFR to be unconstitutional as a violation of the Eighth Amendment protections against excessive fines, facially and as applied to Doe;

d. Declare the IFR to be unconstitutional as a violation of the Fifth Amendment's guarantee of substantive and procedural due process, facially and as applied to Doe;

e. Award Plaintiff costs and reasonable attorney fees under the Equal Access to Justice Act; and

f. Grant such other relief as the Court deems just and proper.

Dated, July 8, 2026

Respectfully submitted,
J. DOE, Plaintiff

By:     /S/ Rohmah A. Javed

Rohmah A. Javed, VSB#101898
Daniela Czemerinski, *pro hac vice pending*
Madeline Sachs, VSB# 101679
THE LEGAL AID JUSTICE CENTER
6402 Arlington Blvd #1130
Falls Church, VA 22042
[T] (703) 778-3450
rohmah@justice4all.org
daniela@justice4all.org
madeline@justice4all.org

Alexander Vincent Kornya, VSB#100878
THE LEGAL AID JUSTICE CENTER
1000 Preston Ave, Ste. A
Charlottesville, VA 22903
[T] (434) 367-6068
alexkornya@justice4all.org

39